**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Dated: March 30 2018

John P. Gustafson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 17-32368 |
| | ) | |
| Brian D. Lisowski, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | Judge John. P. Gustafson |

**MEMORANDUM OF DECISION RE: UNITED STATES TRUSTEE'S MOTION TO DISMISS CHAPTER 7 CASE FOR ABUSE UNDER SECTION 707(b)**

This case comes before the court on the United States Trustee's ("the UST") Motion to Dismiss for Abuse Pursuant to 11 U.S.C.§707(b)(1) and (b)(3) ("Motion") filed on October 23, 2017. [Doc. #14]. An Order for Evidentiary Hearing was entered on October 24, 2017, setting a trial date of December 28, 2017. [Doc. #15]. Debtor Brian D. Lisowski ("Debtor") filed a Response to UST's Motion ("Response") on November 11, 2017. [Doc. #17]. Debtor's Response was filed by attorney Gordon Barry ("Debtor's Counsel").

The court held an evidentiary hearing on the Motion that Debtor, Debtor's Counsel, Counsel for the UST, and bankruptcy auditor for the UST Catharine S. Lowman attended in person. At the hearing, the parties presented testimony and other evidence in support of their respective positions.

The district court has jurisdiction over this Chapter 7 case pursuant to 28 U.S.C. §1334(a) as a case under Title 11. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 1939, 191 L.Ed.2d 911, 918 (2015); *Harper v. The Oversight Comm. (In re Conco)*, 855 F.3d 703, 709 (6th Cir. 2017); *In re Norenberg*, 554 B.R. 480, 483 (Bankr. D. Mont. 2016). This case has been referred to the bankruptcy court by the district court under its general order of reference. 28 U.S.C. §157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings to determine a motion to dismiss under §707(b) are core proceedings that this court may hear and decide. 28 U.S.C. §157(b)(1), (b)(2)(J) and (O); *Norenberg*, 554 B.R. at 482; *In re Floyd*, 534 B.R. 729, 731 (Bankr. N.D. Ohio 2015); *In re Rooney*, 436 B.R. 454, 455 (Bankr. N.D. Ohio 2010).

Having considered the Motion, the response and arguments of counsel, and having reviewed the entire record in this case, for the reasons stated below the court will deny the UST's Motion.

## FACTUAL BACKGROUND

Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code on July 27, 2017, stating that his debts were primarily consumer debts. [Doc. #1, p. 6, Part 6, Q. 16a; p. 8, Part 4, Q. 7]. Debtor's Schedule D shows total secured debt in the amount of $148,109.00. [Doc. #1, p. 20]. Debtor's secured debt total includes a mortgage of $127,000.00 secured by Debtor's residence in Sylvania, Ohio, which was valued at $135,000.00 on Schedule D. [Doc. #1, p. 19]. A 2015 Jeep Cherokee, valued at $13,000.00, was listed as serving as collateral for a loan of $21,109.00. [*Id.*]. Debtor's Statement of Intention reflects that Debtor intends to reaffirm on the mortgage encumbering his residence located in Sylvania and surrender the 2015 Jeep Cherokee. [Doc. #1, p. 40]. A Reaffirmation Agreement pertaining to the mortgage debt secured by Debtor's residence was filed on October 5, 2017. [Doc. #13].

Debtor's bankruptcy schedules reflect a single unsecured priority debt of $1, owed to Debtor's ex-wife, as a domestic support obligation. [Doc. #1, p. 8, Part 2, Q. 3a; p. 20]. Debtor's schedules further show unsecured nonpriority debts in the amount of $42,118.63. [Doc. #1, p. 8, Part 2, Q. 3b; pp. 22-25]. The non-priority unsecured debt may increase based upon the filing of a deficiency claim after the liquidation of Debtor's surrendered 2015 Jeep Cherokee.

Debtor's Schedule I reflects a combined monthly income of $3,554.03 [Doc. #1, p. 29], though at the hearing, Debtor's counsel submitted three corrections: 1) Line 5c, "Voluntary contributions for retirement plans," was changed from $108.33 to $216.16; and 2) Line 5d,

"Required repayments of retirement fund loans," was changed from $186.51 to $150.04. With those corrections figured in, Debtor's combined monthly income would total $3,482.67. Debtor's counsel also submitted a single adjustment to Schedule J: Line 11, "Medical and dental expenses," changing the amount from $80.00 to $150.00. Based on these amended figures, Debtor's net monthly income would be a negative $141.33. Per Debtor's Form 122A Means Test Calculation, he has above median income, and no presumption of abuse arises under 11 U.S.C. §707(b)(2). [Doc. #1, pp. 42-52].

Debtor works primarily as a Sylvania firefighter, but also works three secondary, intermittent, part-time jobs: 1) Lucas County emergency medical services ("EMS") worker/paramedic instructor; 2) University of Toledo stand-by paramedic; and 3) State of Ohio Shared Services ambulance inspector. He testified that his financial difficulties started when he and his wife formally separated in July of 2017. Per the Separation Agreement, Debtor agreed to pay his ex-wife $1,000.00 a month beginning July 15, 2017 for a term of one year that ends in June of 2018. [UST Ex. 9-6]. Although the Separation Agreement states that Debtor is the residential parent and primary custodian of the separated couple's minor child [UST Ex. 9-8], Debtor testified that he agreed to waive his right to child support so that he could keep his firefighter's pension. [UST Ex. 9-9, 9-10]. Debtor's divorce from his ex-wife was finalized in August of 2017.

Debtor testified that he provides financial support to his adult step-daughter, who plans to return to university in Columbus in January of 2018. Per Debtor's testimony, all three members of his household suffered significant mental trauma from the breakdown of Debtor's marriage in November of 2016. Evidence was provided pertaining to the time and expense related to the medical care and treatment received by Debtor and his two daughters. Debtor also recently recovered from a workplace back injury that required surgery and a break from work for a little over a month. Additionally, Debtor testified that his primary employer was in the process of changing his traditional medical insurance plan into a health savings account ("HSA") plan and that he expected medical costs to rise in the future as a result. The evidence regarding these increased health insurance costs lacked specificity.

In addition to the divorce and the costs of supporting two dependents with medical issues, Debtor testified that mounting credit card debt, payments on a $22,000.00 private loan, and a decrease in already unpredictable work-related income further added to his financial difficulties, and led to his filing for bankruptcy. Debtor explained that because he was the only named payer with regard to multiple credit cards and a private loan, his separation, and then divorce from his

3

ex-wife led to him being the only party making payments on those debts. Debtor also explained that while he had planned to use the private loan to pay off and consolidate some of his credit card debt, his now ex-wife had used the private loan money to fund her business and pay off her debts. Further, Debtor stated that his opportunities for earning extra pay as a firefighter had decreased because he was being given less "acting officer" time since May of 2017. Accordingly, he expected to earn around $10,000.00 less in 2018 than he had in 2017. Debtor explained that while working as an "acting officer," his rate of pay was about 15% greater than his normal wage.

Debtor testified that he originally began working three secondary jobs in order to support his family because his ex-wife had health problems that prevented her from finding regular work. Debtor also stated that during his marriage he took on the three secondary jobs in order to financially support his now ex-wife's efforts to start her own business. Debtor further testified that working four jobs had begun wearing on him and that he would be ending his work as a stand-by paramedic and emergency medical services worker/instructor once his spousal support obligation ends in June of 2018. Debtor explained that, without being able to proceed with his Chapter 7 bankruptcy, he would be forced to give up his house and was unsure how he would afford his family's medical costs.

The UST presented testimony that revolved around: 1) the extent to which Debtor allegedly misrepresented his income and expenses on the Petition and Schedules; 2) the fact that Debtor's $1,000.00 a month spousal support obligation would come to an end in June of 2018; and 3) expenditures Debtor made that appeared inconsistent with a need for Chapter 7 bankruptcy relief.

The UST presented testimony of Catharine Lowman, a bankruptcy auditor for the UST's office, who testified that her analysis of Debtor's Petition, Schedules, and pay advices led her to conclude that Debtor's filing appeared to have misreported his income. Specifically, Ms. Lowman testified that Debtor's voluntary deferred compensation[1] contributions of around $200.00 a month and payments on a loan that Debtor had taken against his retirement funds raised concerns that Debtor's filing constituted an abuse of Chapter 7. Ms. Lowman explained that Debtor's retirement payments practically doubled in June of 2017 from $100.00 a month to around $200.00

---

1/ The court notes that although the parties used the general term "deferred compensation" throughout the hearing, the parties were referring to Debtor's 457(b) retirement plan, a 401(k)-like plan implemented by state and local governments. *See*, I.R.S. Publ. 4484 (Rev. 2-2015), *available at* https://www.irs.gov/pub/irs-pdf/p4484.pdf (describing various retirement plans). For ease of reference, the court will use the term "retirement" throughout this opinion.

17-32368-jpg    Doc 25    FILED 03/30/18    ENTERED 03/30/18 15:03:48    Page 4 of 10

a month [UST Ex. 3-1 through 3-12], indicating that Debtor's Schedule I misrepresents the amount of funds available to pay creditors.

Additionally, Ms. Lowman testified that her analysis of Debtor's pay advices and tax returns suggested that Schedule I understated Debtor's income, particularly with regards to his three secondary jobs. Per Ms. Lowman's analysis, Debtor understated his monthly EMS income by $83.00, his monthly stand-by paramedic income by $30.00, and his yearly ambulance inspector income by about $3,000.00. Ms. Lowman also noted that Debtor's yearly income did not appear to have decreased during 2017 and that Debtor's $1,000.00 a month spousal support obligation would soon be ending, suggesting that, even with the reduction from ending two of his secondary jobs taken into account, that Debtor would have at least $329.00 in net monthly income[2] to pay creditors beginning in June of 2018.

In response to Ms. Lowman's testimony, Debtor's counsel argued that, despite minor corrections made to lines 5c and 5d of Schedule I, Debtor's July 27 Petition and Schedules were still accurate as of the date of their filing and that Ms. Lowman's analysis improperly took into account variable pay received in months following Debtor's July filing. Further, Debtor testified that the increase in retirement contributions reflected on his pay stubs can be attributed to a clerical error by his employer and that he would be willing to stop making the contributions if need be.

The UST questioned Debtor with regards to three large deposits into Debtor's bank account that took place in 2017: $7,300.00 deposited on February 14 [UST Ex. 7-21]; $2,900.00 deposited on April 4 [UST Ex. 7-26]; and $1,809.65 deposited on May 24. [UST Ex. 7-31]. Debtor explained that the April deposit was a check from his parents, the May deposit was an escrow refund from refinancing his mortgage, and the February deposit was the disbursement of his retirement loan. Debtor further explained that he still owed just under $7,000.00 on the retirement loan due to an accounting error on the part his employer. Debtor's testimony regarding the problems he had with employer errors related to the retirement contributions and the loan was credible.

The UST also questioned Debtor with regards to two Las Vegas trips that Debtor took during 2017. Debtor explained that his parents paid for the bulk of the cost of trips via the check he deposited in April of 2017 and that he did not believe the trips should prevent him from pursuing his Chapter 7 bankruptcy.

---

2/ Ms. Lowman's $329.00 net monthly income estimate did not take into account the adjustments to income and expenses introduced by Debtor at the hearing.

5

## LAW AND ANALYSIS

Where debts are primarily consumer debts, as in this case, the court may, after notice and a hearing, dismiss a Chapter 7 petition "if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]." 11 U.S.C. §707(b)(1). Under §707(b)(2) and (3), Congress provided two methods by which a party may prove abuse. As the movant, the UST carries the overall burden of demonstrating, by a preponderance of the evidence, that Debtor's case should be dismissed. *In re Weixel,* 494 B.R. 895, 901 (6th Cir. BAP 2013).

Section 707(b)(2)(A) sets forth an extensive "Means Test" calculation to determine whether there is a presumption of abuse. The Means Test calculation permits a debtor to subtract certain allowed deductions from the debtor's "current monthly income". Where the Means Test calculation results in sufficient disposable income such that a presumption of an abusive filing arises, a debtor may rebut that presumption by demonstrating "special circumstances" as set forth in §707(b)(2)(B). Whether the presumption does not arise, or arises and is rebutted, the court may still dismiss a case for abuse under §707(b)(3).[3]

Under §707(b)(3), in determining whether granting relief would be an abuse, the court is required to consider "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances...of the debtor's financial situation demonstrates abuse." 11 U.S.C. §707(b)(3)(A) and (B). These provisions were added as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").

Before BAPCPA, courts considered whether to dismiss a case for "substantial abuse" under §707(b) based on the "totality of the circumstances." *See, e.g., In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989); *In re Price*, 353 F.3d 1135, 1139 (9th Cir. 2004). The Sixth Circuit explained that "substantial abuse" could be predicated upon either a lack of honesty or want of need, to be determined by the totality of the circumstances. *Krohn*, 886 F.2d at 126. Congress incorporated this judicially created construct in §707(b)(3). Although pre-BAPCPA case law applying these concepts is still helpful in determining abuse under §707(b)(3), Congress lowered the standard for dismissal in changing the test from "substantial abuse" to "abuse." *McGowan v. McDermott*, 445 B.R. 821, 824 n.5 (N.D. Ohio 2011); *In re Mestemaker*, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007). Also removed from §707(b) by the BAPCPA was the "presumption in favor of granting the relief requested by the debtor." *See*, *In re Witcher*, 702 F.3d 619, 622 (11th Cir. 2012); *In re*

---

3/ The UST's Motion to Dismiss only seeks relief under §707(b)(3). [Doc. #14].

*Srikantia*, 417 B.R. 505, 508 (Bankr. N.D. Ohio 2009); *In re Mestemaker*, 359 B.R. 849, 856 (Bankr.N.D.Ohio 2007).

## I. Is The Filing An Abuse Under Section 707(b)(3)'s Totality Of The Circumstances Test?

In this case, the UST does not argue that Debtor filed his petition in bad faith. Instead, the UST asserts that the totality of Debtor's financial circumstances demonstrates that he is not needy and that granting the Debtor a discharge would be an abuse of the provisions of Chapter 7 under §707(b)(3). The "totality of the circumstances test" allows the court to consider both pre-petition and post-petition circumstances. *See, U.S. Trustee v. Cortez (In re Cortez)*, 457 F.3d 448, 455 (5th Cir. 2006)("Section 707(b) does not condition dismissal on the *filing* of bankruptcy being [an abuse] but rather on the *granting of relief,* which suggests that in determining whether to dismiss under § 707(b), a court may act on the basis of any development occurring *before* the discharge is granted."); *In re Ng*, 477 B.R. 118, 130-131 (9th Cir. 2012); *In re Mestemaker,* 359 B.R. at 855-56.

Debtors are "needy" when "[their] financial predicament warrants the discharge of [their] debts" in a Chapter 7 case. *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434 (6th Cir. 2004). Factors relevant to determining whether a debtor is "needy" include the ability to repay debts out of future earnings, which alone may be sufficient to warrant dismissal under some circumstances. *Krohn*, 886 F.2d at 126; *McGowan*, 445 B.R. at 824; *In re Robinson*, 2015 WL 1087316 at *3, 2015 Bankr. LEXIS 719 at *8 (Bankr. N.D. Ohio March 9, 2015). Other factors include "whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities." *In re Bender*, 373 B.R. 25, 30 (Bankr. E.D. Mich. 2007); *In re Burge,* 377 B.R. 573, 577 (Bankr. N.D. Ohio 2007); *see also, Krohn*, 886 F.2d at 126.

Debtor's schedules show that he is eligible to be a debtor under Chapter 13. His secured and unsecured debts are less than the Chapter 13 debt limits. *See*, 11 U.S.C. §109(e). Debtor has regular income that appears to be relatively stable, although he has reduced opportunities for earning "acting officer" pay at his primary job as a firefighter. He also testified that he will be ending his secondary work as a stand-by paramedic and emergency medical technician/instructor.

Debtor's income also varies based upon the availability of overtime as a firefighter and of the secondary work he plans to continue as an ambulance inspector.

Under §707(b)(3), the UST asserts that Debtor has sufficient disposable income to repay at least a portion of his unsecured debts out of future earnings, in a Chapter 13 plan or otherwise. The UST argues that the Debtor's ability to make voluntary retirement payments suggests that Debtor has more disposable income than his Petition represents, and that Debtor's payments on the retirement loan and retirement contributions should instead be "applied to a ratable distribution among all Debtors' unsecured creditors." *Robinson*, 2015 WL 1087316 at *3, 2015 Bankr. LEXIS 719 at **10-11. However, "the totality of a debtor's individual circumstances must be considered in determining whether a debtor's [retirement] contributions and repayment of [retirement] plan loans are reasonably necessary expenses in a §707(b)(3) analysis." *Robinson*, 2015 WL 1087316 at *4, 2015 Bankr. LEXIS 719 at **11-12. Relevant factors include: "(1) the debtor's age and time left until retirement; (2) the amount of the debtor's existing retirement savings (3) level of yearly income; (4) overall budget; (5) amount of monthly contributions; (6) needs of any dependents; and (7) other constraints that make it likely that retirement contributions are reasonably necessary expenses for this particular debtor." *Id.*; *In re Beckerman*, 381 B.R. 841, 848 (Bankr. E.D. Mich. 2008).

Here, Debtor pays retirement expenses consisting of $216.16 a month in retirement contributions and $150.04 a month in retirement loan payments. Debtor credibly testified that he still owes just under $7,000.00 on his retirement loan due to a series of clerical errors on the part of his employer.

The UST also argues that the fact that Debtor's $1,000.00 a month spousal support obligation will come to an end in June of 2018 suggests that, even without the income from working two of the three secondary jobs, Debtor will soon be able to contribute funds towards repaying his unsecured creditors through a Chapter 13 plan. The court finds that, after adjusting Debtor's reported income in reliance on: 1) Debtor's plans to end two of his secondary jobs; 2) the end of Debtor's support obligation; and 3) the adjustments to Schedules I and J Debtor submitted at the hearing, Debtor's budget would reflect about $187.67 a month[4] available to pay creditors once his spousal support obligation ends in June of 2018.

---

4/ With the adjustments submitted at the hearing figured in, Debtor maintains a net monthly income of -$141.33. After further adjusting Debtor's income via eliminating the $671.00 received from the two secondary jobs Debtor will

Though Debtor's ability to pay creditors through a Chapter 13 plan, as evidenced by his voluntary retirement payments, the end of his spousal support obligation, and Las Vegas vacations, weighs in favor of regarding a grant of Debtor's Chapter 7 discharge as an abuse, the court finds that Debtor's testimony pertaining to uncertain, potentially significant future expenses is credible and that it strongly points in the opposite direction. Specifically, Debtor testified that all three members of his household, his two daughters and himself, have suffered due to his marriage's traumatic dissolution and that they have incurred increased medical expenses as a result, including those from counseling and prescription medication purchases. Additionally, the court finds that, at a minimum, the change in Debtor's insurance coverage from that of a traditional plan to an HSA plan increases the level of uncertainty in terms of Debtor's ability to pay medical costs in the future. While the court notes that it would have been helpful for Debtor to have introduced specific documentary evidence pertaining to his family's medical costs, the court finds that Debtor has presented evidence in the form of credible testimony sufficient to establish that Debtor's family will continue to incur medical costs that weigh against finding that the granting of a Chapter 7 discharge would be an abuse.

In addition, Debtor credibly testified to the fact that he did not expect to earn as much from his primary work as a firefighter as he had in prior years. The court finds Debtor credible in terms of his explanation that he expects to continue to receive less "acting officer" time than he had in the past, time that entails a 15% increase in pay. The court also finds Debtor's testimony pertaining to the variability of his ambulance inspector pay credible, that the $389.00 figure Debtor provided as his monthly ambulance inspector pay [Doc. #1, p. 29, Line 8a] was substantially accurate, and that his increased income during 2017 likely figures as an outlier in terms of expected future earnings. Further, the court finds that, aside from the two Las Vegas trips paid for in large part by his parents, Debtor's Schedules, testimony, and having surrendered his primary vehicle suggest that Debtor lives a relatively modest lifestyle.

The Debtor presented other relevant evidence, including the manner in which his debt was accumulated. Because of his then-wife's health issues, and her inability to obtain regular employment, substantial funds were expended in building her business – a business that Debtor no longer benefits from because of the divorce. There was also testimony about how expenses for

---

stop working [Doc. #1, p. 29, Lines 8g, 8h] and adding the $1000.00 a month that corresponds to the end of Debtor's spousal support obligation [*Id.*, Line 5f], Debtor's net monthly income as of June 2018 will be around $187.67.

9

care of his daughter were kept to a minimum, testimony that reflected that some uncomfortable belt-tightening had been undertaken. Had there been no belt-tightening, professional care expenses could have left no issue of disposable income in this case.

On balance, the court finds that this is a very close case in which both the UST and Debtor have presented credible evidence relevant to a §707(b)(3) determination. The UST established that, given Debtor's pay advices, Schedules and the fact that his spousal support obligation will end soon, Debtor would have sufficient funds to pay creditors through a Chapter 13 plan as of June of 2018 were his Chapter 7 case dismissed or converted. However, this determination relies on a prediction that Debtor's expenses and income will remain largely the same going forward. To that end, Debtor credibly testified that he expected to earn significantly less during the coming year (even assuming he remains healthy enough to continue working as a firefighter) and that all three members of his household will continue to incur variable medical expenses, costs that may increase based upon Debtor's insurance plan change. Moreover, Debtor's ability to pay creditors through a Chapter 13 plan is merely one factor that must be weighed against the totality of Debtor's circumstances. *See*, *In re Stewart*, 383 B.R. 429, 434-35 (Bankr. N.D. Ohio 2008)(holding no abuse under §707(b)(3) even though debtor had $324.49 a month available to pay creditors through a Chapter 13 plan).

Particularly in light of the relatively small amount of disposable income available to Debtor once his secondary work reduction and expense changes are figured in, the court finds that the UST has not met its burden of proof, based on the challenges Debtor described in his testimony. The burden under §707(b)(3) lies with the UST, and the UST has not presented enough evidence for this court to regard Debtor's pursuit of Chapter 7 relief as an abuse. *See*, *Weixel,* 494 B.R. at 901. Accordingly, although the Debtor's adjusted net monthly income is greater than his necessary and reasonable expenses in an amount sufficient to allow him to fund a Chapter 13 Plan, the court finds that, based on the facts in this case and a review of the totality of the circumstances, the UST has not met its burden of demonstrating that allowing this case to proceed under Chapter 7 would be an abuse under §707(b)(3).

**THEREFORE**, based on all of the foregoing reasons and authorities, good cause appearing,

**IT IS ORDERED** that the United States Trustee's Motion to Dismiss [Doc. #14] be **DENIED**.